UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DONNEL SMITH, | : | Case No. 3:16-cv-428 |
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Donnel Smith brings this case challenging the Social Security Administration's denial of his applications for benefits. He applied for Disability Insurance Benefits on October 24, 2013 and for Supplemental Security Income on September 16, 2014, asserting that he could no longer work a substantial paid job. Administrative Law Judge (ALJ) George D. McHugh concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ McHugh's non-disability decision.

## II. Background

Plaintiff asserts that he has been under a "disability" since January 2, 2013. He was thirty-seven years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has at least a high school education. *See* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). [2]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ McHugh that he had bariatric surgery in 2009. (Doc. #6, *PageID* #93). At his max, he weighed 433 pounds. *Id*. At the time of the hearing, he weighed 265 pounds. *Id.* at 89-90. "[T]he surgery initially went well but I started hemorrhaging in the recovery room." *Id.* at 93. His doctors had to "take [him] back into surgery to see why [he was] vomiting blood. *Id*. A month after his surgery, he returned to the hospital "because the scar tissue had covered the new stomach and I was unable to eat." *Id*.

In August 2013, Plaintiff underwent surgery "to remove scar tissue in hopes that would reduce the pain. The scar tissue ended up coming back more aggressive." *Id.* at 92. A month after surgery, he spoke to his surgeon, "and [the surgeon] basically busted out in tears because he couldn't help me. He did all he could …. [B]y that point I had

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

four surgeries, including the gastric bypass till that surgery in August, and he had hoped that that would help me … as a last ditch effort and … it didn't, and he apologized because he's in a business of helping his patients and he couldn't help me." *Id.* at 99.

Plaintiff explained that he "never healed and the pain was worse than before than ever …." *Id.* His pain is primarily located from his ribcage to the bottom of his stomach. *Id.* at 103. On a scale from one to ten, he estimated that pain level was typically seven. *Id.* A few times a week, Plaintiff cannot "move because the pain is so great." *Id.* at 116. On average, this pain occurs twenty of thirty days in a month. *Id.* at 117.

He takes several medications to reduce his pain: gabapentin (for nerve damage), six-hundred milligrams three times a day; oxycodone, thirty milligrams every four hours; and OxyContin, twenty milligrams every twelve hours. *Id.* at 103.

In November 2013, Plaintiff was involved in a car accident with a tanker truck. *Id.* at 101. And, since the accident, he has not been able to "consistently walk on [his] own without [his] legs buckling. *Id.* He purchased a cane—at his doctor's suggestion—to help him keep his balance. *Id.* His doctor determined that he developed bursitis in his hips and arthritis in his lower back. *Id.* His treatment included both medication and injections—but they were unsuccessful. *Id.*

Plaintiff suffers from depression and anxiety, and he has attempted suicide more than once. *Id.* at 105. "[W]hen the pain is at its highest level[,] the depression gets worse, [he] feel[s] worthless, and [he] constantly think[s] about taking [his] own life because of it." *Id.* He also was diagnosed with schizophrenia and bipolar disorder. *Id.* Further, "I hear voices that constantly tell me to do things to myself …." *Id.* He has

3

anxiety and/or panic attacks "sometimes once or twice a week." *Id.* at 110. During an attack, he has shortness of breath, hears voices, feels like his head is cloudy, and feels like he cannot think straight. *Id.*

At the time of the hearing, Plaintiff was seeing a therapist, Dr. Lana at the Wellness Center, once every week or two weeks. *Id.* at 106. His doctors have prescribed several medications, including Geodon, clonazepam, and buspar. *Id.* at 108, 110. "For the most part ...," his medication helps. *Id.* at 108.

On a typical day, Plaintiff spends the "bulk" of his time in a recliner "trying to get comfortable. *Id.* at 112. He watches "a couple hours" of television. *Id.* He tries to read when his pain is not too bad. *Id.* When his pain is at its highest level, he does not do anything. *Id.* at 109. If he has to shower, he has a shower chair or his mother helps him. *Id.* at 112. He does not do any household chores. *Id.* He tries to go to church as much as he can. *Id.* at 113. He has visitors—his grandparents and some friends. *Id.* Plaintiff has difficulty sleeping because his pain wakes him up. *Id.* at 107. In an average night, he sleeps about three hours. *Id.* He has a driver's license but cannot "drive much because of the pain." *Id.* at 90. He usually only drives a couple times a week. *Id.* at 91. Plaintiff estimated that he could walk "about a block if I'm lucky on a good day." *Id.* at 104. He cannot lift more than ten pounds and "sometimes" has trouble lifting a gallon of milk. *Id.*

### B. Medical Opinions

#### i. K. Kevin Moffa, M.D.

In January 2014, Plaintiff's treating physician, Dr. Moffa, opined that Plaintiff "has difficulty doing most activities due to pain levels. *Id.* at 924. Further, he has severe

limitations of functional capacity and is not capable of minimum (sedentary) activity. *Id*.

Dr. Moffa completed interrogatories in November 2014. *Id.* at 625. He reported that he has been Plaintiff's primary care physician for ten years and has treated him for the following medical problems: chronic abdominal pain due to recurrent abdominal adhesions, recurrent depression, anxiety, bipolar I, left hip pain, and schizophrenia. *Id.* at 625-26. He opined that Plaintiff was not able to be prompt and regular in attendance because of "difficulty in getting ready due to pain limiting ability for movement." *Id.* at 626. Further, due to his high pain level and mental stress, he is unable to withstand the pressure of meeting normal standards of work productivity and work accuracy. *Id.* at 627. He cannot demonstrate reliability "due to fluctuating pain levels [and] mood fluctuations." *Id.*

Dr. Moffa opined that, as a result of Plaintiff's impairments and/or treatment, he would be absent three times a month. *Id.* at 632. Additionally, he could lift/carry ten pounds occasionally and five pounds frequently. *Id.* at 628. He can stand/walk for ten minutes at a time for two hours total during an eight-hour workday. *Id.* He must use a cane. *Id.* He can sit for thirty minutes at a time for a total of four hours. *Id.* at 629. Plaintiff can never climb or kneel and can occasionally balance, stoop, crouch, and crawl. *Id.* He has abdominal pain with reaching, pushing, and pulling and speaking, and he has difficulty speaking when he has severe pain or depression. *Id.* at 630. Dr. Moffa concluded Plaintiff could not perform sedentary work. *Id.* at 632.

### ii. Esberdado Villanueva, M.D. & Michael Delphia, M.D.

On January 9, 2014, Dr. Villanueva reviewed Plaintiff's records. *Id.* at 145-56.

5

Dr. Villanueva opined that Plaintiff could occasionally lift/carry up to twenty pounds and frequently lift/carry up to ten pounds. *Id.* at 152. He could stand, walk and/or sit for six hours in an eight-hour workday. *Id.* He could never climb ladders, ropes, and scaffolds; could frequently balance and climb ramps/stairs; and could occasionally stoop, crouch, or crawl. *Id.* He should avoid concentrated exposure to hazards. *Id.* at 153. Dr. Villanueva concluded Plaintiff is not under a disability. *Id.* at 156.

Dr. Delphia reviewed Plaintiff's records on March 20, 2014 and confirmed Dr. Villanueva's assessment. *Id.* at 159-74.

### iii.     Giovanni Bonds, Ph.D.

Dr. Bonds initially evaluated Plaintiff in January 2014 and had twelve sessions of therapy. *Id.* at 621-24, 1089. She diagnosed Major Depressive Disorder, severe, without psychotic features, and noted, "Rule out … Pain Disorder Associated with Psychological Factors and a General Medical Condition." *Id.* at 623. She succinctly summarized Plaintiff's history, mental health, and goals:

> [Plaintiff] presents with overlapping issues of physical and emotional pain. He is still struggling with the hurt, shame and insecurity brought on by his childhood experiences of being neglected and abandoned by his mother during her period of drug addiction. He became an extremely obese man and had gastric bypass surgery to improve his health and quality of life, but this backfired and he developed complications that have made his life worse, costing him his job, his home, and his independence. He stated that he is seeking therapy now because he feels overwhelmed, does not know what to do and he feels unsure of his direction. What he wants from therapy is to manage his emotions and to able to have a positive outlook despite the adversity in his life.

6

*Id.*

Dr. Bonds completed a medical questionnaire on March 18, 2014—after having had seven sessions with Plaintiff. *Id.* at 619-20. She reported that his mood was depressed on most days and he "expresse[d] feelings of hopelessness and helplessness." *Id.* at 619. He had problems with concentration, persistence, and daily activities because of his chronic pain. *Id*. In addition, his chronic pain and illness were triggers for his depression. *Id*. Dr. Bonds noted that he was compliant with treatment. *Id.* at 620. Nevertheless, she opined, "there has been little symptom change or functional improvement." *Id*. Further, Plaintiff's "[a]bility to tolerate stress is affected by depressed mood, low energy level, fatigue, and pain. [He] has difficulty with consistently doing daily tasks [and] taking care of business for himself." *Id*.

In April 2015, Dr. Bonds completed interrogatories and a mental health questionnaire. *Id.* at 1089-131. She explained that Plaintiff's "depression and anxiety were made worse by his severe health problems, specifically his chronic pain complaints. In a cyclical manner depression and anxiety also heightened his pain experience and affected how he coped with his physical condition." *Id.* at 1090. She opined, his "[p]ain, depression and fatigue would limit regular attendance. He missed therapy appointments due to pain and these were scheduled either weekly or every 2 weeks." *Id.* at 1091. Although Plaintiff is cooperative and pleasant, his depression and pain drive him to distance himself from others. *Id.* at 1092. He could not withstand the pressure of meeting normal standards of work productivity and accuracy without significant risk of worsening his impairments. *Id*. Dr. Bonds explained, "The demands for productivity and

7

keeping a work schedule would overwhelm him. He would want to do a good job and be productive, but his physical [and] mental conditions would limit him [and] then he would feel guilty, more inadequate, depressed and anxious, which would increase his pain level." *Id.* Pain, depression, and anxiety interfere with his ability to concentrate and his lack of sleep prevents him from being "fully alert and focused on a job." *Id.*

Dr. Bonds opined that Plaintiff had a moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; and marked deficiencies in concentration, persistence, and pace. *Id.* at 1097, 1130. His impairments and/or treatment would cause him to be absent from work more than three times a month. *Id.* at 1130. His impairments have lasted for at least twelve months and his prognosis is poor. *Id.* at 1129. After twelve sessions, Dr. Bonds saw "[n]o significant improvement in symptoms or functional capacity." *Id.*

### iv.   Katherine Fernandez, Psy.D. & Tonnie Hoyle, Psy.D.

On January 7, 2014, Dr. Fernandez reviewed Plaintiff's records. *Id.* at 145-56. She found that Plaintiff has four severe impairments—"other disorders" of gastrointestinal system, obesity, affective disorders, and anxiety disorders. *Id.* at 149. Dr. Fernandez opined that Plaintiff has mild restriction of activities of daily living; no difficulties in social functioning; moderate difficulties in concentration, persistence and pace; and one or two episodes of decompensation of extended duration. *Id.* at 150. Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; to complete a workday or workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an

8

unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. *Id.* at 154. She concluded that Plaintiff "retains sufficient mental capacity to carry out two-step commands with adequate persistence and pace; but he would struggle with detailed or complex instructions." *Id*. Further, his "ability to handle stress and pressure in the work place would be reduced but adequate to handle the stresses of routine work that did not involve timed tasks or rate quotas. *Id.*

On March 20, 2014, Dr. Hoyle reviewed Plaintiff's record and found that he had one additional severe impairment—other and unspecified arthropathies. *Id.* at 166. She otherwise confirmed Dr. Fernandez's assessment. *Id.* at 159-74.

### III.  **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

9

2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ McHugh to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential

10

steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.

He reached the following main conclusions:

> Step 1: Plaintiff has not engaged in substantial gainful employment since January 2, 2013.
>
> Step 2: He has five severe impairments: gastrointestinal system disorders with residuals of surgery, obesity, chronic hip pain, affective disorder, and anxiety disorder.
>
> Step 3: He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> Step 4: His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) lifting and carrying up to 20 lbs. occasionally, and up to 10 lbs. frequently, (2) standing and walking up to 6 hours, (3) sitting up to 6 hours, (4) no climbing of ropes, scaffolds and ladders, (5) occasional climbing of ramps and stairs, (6) occasional stooping, kneeling, crouching, crawling and balancing, (7) no exposure to dangerous hazards such as unprotected heights or dangerous equipment, (8) no commercial driving as part of job duties, (9) limited to simple, routine and repetitive tasks, but not at a production rate pace or strict quota, (10) limited to a static work environment, with few changes in the work setting, (11) in addition to normal breaks, off-task 10% of the time and absent one day a mouth, and (12) a sit[-]stand option where the person can alternate between sitting and standing every 30 minutes."
>
> Step 4: He is unable to perform any of his past relevant work.
>
> Step 5: He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 60-73). These main findings led the ALJ to ultimately conclude that

Plaintiff was not under a benefits-qualifying disability. *Id.* at 73.

## V. Discussion

Plaintiff contends that the ALJ failed to give appropriate weight to her treating sources' opinions and erred in finding that he was not credible. The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of medical opinion evidence and the ALJ's findings that Plaintiff was not entirely credible.

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

12

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ McHugh assigned moderate weight to Dr. Bonds' assessment and, "in particular, her report and interrogatories that [Plaintiff] does not have marked mood swings, that his general cognitive abilities are not significantly limited, that he is conscious of social norms and generally behaves accordingly in social situations[.]" (Doc. #6, *PageID* #70) (citation omitted). The ALJ recognized that Dr. Bonds is Plaintiff's treating psychologist and provided a summary of her opinions.[3] *Id.* at 64. Elsewhere in his decision, the ALJ cited the Regulation (20 C.F.R. § 404.1527) and Social Security Ruling 96-2p, 1996 WL 374188, that contain and describe the legal criteria under which ALJs must weigh medical sources' opinions, including treating sources' opinions. *See* Doc. #6, *PageID* #65. In addition, he discussed the treating

---

[3] ALJ McHugh's summary minimizes Dr. Bonds' opinions. For example, the ALJ states, "She said that pain, depression, and fatigue would seriously interfere with [Plaintiff's] ability to be prompt and regular in attendance at work …." (Doc. #6, *PageID* #69). The question asks, "is it reasonably probable that [Plaintiff] has been capable of functioning at a high enough level to [be prompt and regular in attendance] on a regular, sustained basis, in a routine work setting, in a competitive job placement, any time from the date [he] last worked through the date you last treated [him] …?" *Id.* Dr. Bonds' unequivocally marked "NO" and then explained, "Pain, depression and fatigue would limit regular attendance. …." *Id.* She did not indicate that his pain, depression, and fatigue would seriously interfere with his ability to be prompt and regular in attendance—she indicated that he could not be.

13

physician rule when he evaluated Dr. Moffa's opinion. The ALJ, however, did not do so in connection with his evaluation of Dr. Bonds' opinion. The ALJ's reasoning, therefore, must be carefully examined to see if he considered Dr. Bonds' opinions under the legal criteria mandated by the treating physician rule and by the remaining regulatory factors. *See* 20 C.F.R. § 404.1527(c)(2); *see also* Soc. Sec. R. 96-2p, 1996 WL 374188.

There is no indication in ALJ's McHugh's decision that he even considered the treating physician rule when he weighed Dr. Bonds' opinions. This failure to address the treating physician rule erroneously ignores the hierarchy established by the Regulations and fails to give any deference to Plaintiff's treating psychologist's opinions. This constitutes error. *See Gayheart,* 710 F.3d at 377 (citation omitted) ("The failure to provide 'good reasons' for not giving [a treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating physician rule that is at the heart of [the] regulation."); 20 C.F.R. § 404.1527(c)(2) ("[W]e give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations....").

The ALJ's discussion of the factors is incredibly limited as well. He correctly found that Dr. Bonds treated Plaintiff at twelve sessions between January and June 2014. (Doc. #6, *PageID* #70); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a

treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

He then concludes, "neither her treatment records nor information she provided in response to interrogatories … establish an inability to perform work-related tasks in a[] low stress, non-demanding work environment where he is not required to perform difficult or skilled tasks."  (Doc. #6, *PageID* #70) (citing Exhibits 7F and 17F [Doc. #6, *PageID* #s 616-24, 1089-159]).  Substantial evidence does not support the ALJ's conclusion.  Specifically, the ALJ ignored or overlooked Dr. Bonds' opinion that Plaintiff's impairments or treatment would cause him to absent from work more than three times a month.  *Id.* at 1130.  This is significant because the vocational expert, Brian Lee Womer, testified in response to the ALJ's hypothetical that a person absent two days a month could not "sustain full-time competitive work.  There would be no jobs."  *Id.* at 120, 125.  Thus, regardless of whether Plaintiff's work-related tasks are limited or not, if he is absent two or more times per month, then he is unable to engage in full-time employment.  *Id.* at 632.

Dr. Bonds' responses to interrogatories support her opinion that he would be absent three or more days a month.  She opined he could not be prompt and regular in attendance because of pain, depression, and fatigue.  *Id.* at 1091.  She explained that he missed appointments with her and they were only scheduled once a week or every two weeks.  *Id.*  She reiterated that he could not demonstrate reliability because of his pain and emotional issues.  *Id.* at 1094.  And, he cannot perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *Id.* at 1094.

15

She noted, "More days than not he feels too poorly to do routine personal care or household activities." *Id.*

Dr. Bonds' treatment notes detail Plaintiff's pain and mental health symptoms. For example, she noted at Plaintiff's initial appointment that he described "feeling depressed daily, feeling inadequate, having lost interest in things, withdrawing, being unable to sleep, [and] having difficulty concentrating. Pain is a trigger for depression and anxiety." *Id.* at 1122. Shortly thereafter, he reported that pain was keeping him awake. *Id.* at 1120. And, in February 2014, "he noted his depression is worse because his pain is worse. It is never ending, frustrating, and depressing." *Id.* at 1119. A month later, he was "feeling bombarded with negative thoughts. Everything he does feels like a challenge." *Id.* at 1123. And, his pain ruins "his appetite and eating is painful. He has no energy to work or to do anything." *Id.* In April 2014, he was "focused on pain complaints. He stated that for several days he could not do much of anything and needed help to get in the tub. He has not been able to sleep though he is exhausted." *Id.* at 1124. Plaintiff was not able to "make it [through] the Sunday afternoon [church] service because by then the pain was too great." *Id.* at 1125.

Further, the record as a whole supports Dr. Bonds' opinion. In February 2015, Plaintiff began mental health treatment at Wellness Care. *Id.* at 1401. Treatment notes reveal that his mental health has not improved. At his initial appointment, he had a depressed mood and constricted affect. *Id.* at 1403. In August 2015, he reported auditory hallucinations that told him to hurt or kill himself. *Id.* at 1396. And, when his pain increased, he had more hallucinations. *Id.* He was also experiencing panic attacks. *Id.*

16

Notably, Dr. Moffa, who has treated Plaintiff for over ten years, opined Plaintiff would be absent from work three or more days a month. *Id.* at 625, 632. He further agreed that Plaintiff could not be prompt and regular in attendance and could not demonstrate reliability. *Id.* at 626-27.

Plaintiff's severe pain is also reflected in notes from Julie Chen, M.D., Plaintiff's pain-management physician. She consistently documented that Plaintiff has constant throbbing, radiating, and stabbing pain that is aggravated by activity and walking. *See id.* at 885-902, 936-59. The effects of his pain include decreased sleep, appetite, and activity secondary to pain; increased emotions; and affected relationships with others. *Id.*

The ALJ's single reason does not constitute "good reasons" for assigning Dr. Bonds' opinion moderate weight. *See* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion ….").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

**B.     Remand**

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

Cir. 1994). "Generally, benefits may be awarded immediately 'only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) (quoting, in part, *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). "A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

Review of the evidence of record, including Plaintiff's medical history and the medical-source opinions, reveals the presence of strong evidence that Plaintiff was under a benefits-qualifying disability. The strong evidence includes opinions presented by Plaintiff's treating psychologist, Dr. Bonds, along with her treatment records, and Dr. Moffa, along with his treatment records.

Dr. Bonds and Dr. Moffa opined that Plaintiff would, on average, be absent from work three or more days a month due to his impairments or treatment. As explained above, the vocational expert testified that an individual who missed two or more days of work per month could not sustain full-time employment. Because Plaintiff would be absent—on average—three or more times per month, and therefore, he cannot sustain competitive employment.

The Commissioner is correct to rely upon evidence in the record that tends to be contrary to the conclusion that Plaintiff was under a disability, namely the opinions of the State agency record-reviewing medical consultants. However, given that the State agency physicians completed their reviews before Dr. Bonds provided her most recent

18

opinion, their opinions are minimally probative. This is especially true when compared to Plaintiff's treating doctors' opinions, their extensive treatment notes, and the objective medical evidence presented which support their opinions.

In light of the strong evidence of record while contrary evidence is lacking, there is no just reason to further delay this matter by requiring additional administrative proceedings. *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).

Accordingly, a reversal of the ALJ's decision and a judicial award of benefits are warranted.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be REVERSED;

2. This case be REMANDED to the Commissioner of the Social Security Administration under sentence four of 42 U.S.C. §405(g) for payment of benefits; and

3. The case be terminated on the docket of this Court.


Date: February 12, 2018  *s/Sharon L. Ovington*
　　　　　　　　　　　　　　　　　　　　　　Sharon L. Ovington
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).